12 Ill.2d 574 (1958)
147 N.E.2d 363
THE PENNSYLVANIA RAILROAD COMPANY, Appellant,
v.
CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY et al., Appellees.
No. 34521.
Supreme Court of Illinois.
Opinion filed January 24, 1958.
*575 JAMES B. O'SHAUGHNESSY, ALEXANDER POLIKOFF, and ROBERT H. BIERMA, all of Chicago, (DALSTREAM, SCHIFF, HARDIN, WAITE & DORSCHEL, of counsel,) for appellant.
MARVIN A. JERSILD, RICHARD O. OLSON, CHARLES I. HOPKINS, JR., MARTIN J. KEATING, and M.L. CASSELL, all of Chicago, for appellees.
Decree affirmed.
Mr. JUSTICE HOUSE delivered the opinion of the court:
Plaintiff brought suit in the superior court of Cook County for a declaratory judgment to establish the right in it to use certain railroad tracks constructed by it upon its solely-owned property, and to deny to defendants the right to enter upon and use such tracks and property. The trial court decreed, among other things, that defendants, by virtue of contracts between the parties and their predecessors, have the right to use the tracks and property in question. The appeal is properly directed to the court since a freehold interest is involved.
The three parties to this suit (through their predecessors in interest) around 1900 were interested in the then undeveloped Calumet River area of Chicago. Each railroad at that time contemplated the construction of a track into the area. The parties realized that the construction of one set of tracks that could be used by all the parties concerned would be more economical than independent action. Hence, the parties joined and agreed to, and did later pursuant to such agreement, organize the Calumet Western Railway.
The Calumet Western, which runs north and south for a distance of approximately three miles, is not an operating *576 line. It owns no rolling stock, has no equipment or work force. The tracks were constructed by the owning lines and the interested railroads operated their own trains and cars over the lines of the Calumet Western. It was through the organization of this railroad that each party could accomplish its purpose upon a basis mutually satisfactory to all.
The agreement providing for the organization of the Calumet Western and specifying the division of ownership was executed on February 21, 1900. After the railroad was organized, the parties entered into an operating agreement with it on June 6, 1901. Each of these contracts contained the following paragraph:
"8. Where one or more of the parties hereto may desire to erect, at its or their own expense, improvements upon the property owned by the Calumet Western Railway Company, which may not be approved by all of said parties, the same may be done upon payment to the company of a fair rental for the property so improved; provided, also, that the other parties hereto shall respectively have the right at any time to also use such improvements upon the payment of the pro-rata share of the cost thereof.
"Each party shall likewise have the right, at its own expense, to construct extensions or sidings to industries not located on the property of the company, and the other parties shall respectively have the right at any time to use the same upon payment of the pro rata share of the cost thereof."
Between 1931 and 1948 the Pennsylvania bought several tracts of land the majority of which lies to the east of Calumet Western. In 1955, it sold the eastern portion of this property to the Glidden Company. After the Glidden Company had constructed installations, the Pennsylvania built a spur track from Calumet Western to the industry. This spur runs in a general southeasterly direction approximately 275 feet across Calumet Western property, then across less than 100 feet of land owned jointly by the Pennsylvania and Indiana Harbor Belt, then across approximately 100 feet of property wholly owned by the Pennsylvania where it finally reaches the Glidden Company. In addition, the Pennsylvania built three service tracks angling *577 in a general southeasterly direction from a point where the spur crosses its property to a dead end west of Glidden Company's property line.
Shortly after the construction of this spur line and service tracks, Indiana Harbor Belt and the Rock Island requested the Pennsylvania to advise them of their respective shares of the cost of the tracks so that they could make payment and use the tracks to serve the Glidden Company. The Pennsylvania refused to comply with this request.
This controversy centers around the interpretation of section 8 of the 1900-1901 contracts. Defendants interpret the section to mean that when one party builds an extension or siding to an industry not located on the property of the Calumet Western, the other parties have the right to use it upon payment of the prorata share of the cost. Plaintiff interprets it to mean that it should be applied only to extensions or sidings built on Calumet Western property.
In determining the meaning of section 8, great weight is given to the principal apparent purpose of the parties. (See Restatement of the Law of Contracts, sec. 236(6).) To ascertain the principal apparent purpose the first resort in all cases is to the natural significance of the words employed. Chicago Home for Girls v. Carr, 300 Ill. 478.
Plaintiff contends that the use of the terms "erect" and "improvements" in the first paragraph of section 8 authorizes the building of structures on Calumet Western property and the second paragraph authorizes the construction of tracks or sidings. It then contends that since the second paragraph is not separately numbered and is an integral part of section 8, it relates to construction on Calumet Western property only, as does the first paragraph. We cannot agree that the words "erect improvements" should, in this case, be given the limited meaning of "building structures." Since the term "improvements" generally relates to any amelioration of the condition of property and not solely to buildings (Black's Law Dictionary, 4th ed.), *578 the first paragraph seems to prescribe the terms upon which the parties may improve in any manner the property of Calumet Western. The purpose then of the second paragraph would be to prescribe the terms upon which the parties may use the tracks of the Calumet Western for connection with extensions or sidings built to serve industries located off its property.
Plaintiff argues that the word "likewise" as used in the opening phrase of the second paragraph of section 8 supports its position. It contends that since the word means "in like manner" (Webster's New International Dictionary, 2d ed.), then, to have "in like manner" the right to construct sidings means that this right is limited to Calumet Western property, as is the right which is granted in the first paragraph. This construction of "likewise" is strained. The word is synonymous with "also" (Webster's New International Dictionary, etc.) Using this connotation the phrase reads "each party shall [also] have the right * * *" It seems logical that the parties used "likewise" to express the granting of an additional right and not an additional right with the limitation plaintiff reads into the word.
Plaintiff asserts that section 8 purports to create or convey "rights" and Calumet Western can create or confer rights only with respect to that which it controls, namely, its own property. This contention implies that it is Calumet Western that is conferring the right granted in the second paragraph of section 8. Such is not the case. Section 8 first appeared in the 1900 contract which was executed by the present parties or their predecessors in interest. Calumet Western was not in existence at this time. In fact, one of the purposes of the original contract was a mutual agreement of the parties, each giving certain rights to the others whereby any of them could use property any one of them might acquire in the future.
Plaintiff to further support its position states that the phrase "not located on the property of the company" modifies *579 the word "industries"  not the words "extensions or sidings." We agree that according to the rules of grammar the phrase does modify "industries," but the signatory parties must have realized that for a siding to reach an industry "not located on the property of the company" the siding would have to leave the company's property to reach it.
Plaintiff attempts to rebut this conclusion by stating that the law forbids railroads to build extensions or sidings on and across industry property. It cites American Smelting & Refining Co. 263 I.C.C. 719, which held that exclusive tracks must be owned and maintained by the industry and the furnishing of track without charge to an industry on its own property is preferential and discriminatory treatment prohibited by section 6(7) of the Interstate Commerce Act. (Title 49 U.S.C. sec. 6(7).) The error of this argument is twofold. First, it assumes that the industry to be served is adjacent to Calumet Western, in which case a siding could not legally be built off the Calumet Western property to the industry. When Calumet Western was organized there were no industries in the area and it might well have happened, as it did here, that the siding would pass over land not belonging to the industry. Second, the law to which the plaintiff refers had not been enacted in 1900 or 1901. At that time it was not unlawful to build a siding on an industry's property and was evidently the practice. See: Sioux City Terminal Railway Switching, 241 I.C.C. 53.
We have carefully and fully examined other contentions set forth by plaintiff to support its position, and we reach the conclusion that they all fall short of the mark. Contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation. (City of Beardstown v. City of Virginia, 76 Ill. 34.) To adopt the contentions of plaintiff would be a violation of this rule.
*580 It appears that the parties at the time of the 1900-1901 agreements, contemplated the exploitation of the Calumet River area on a basis mutually satisfactory to all and that they foresaw the building of industries in the area. It is apparent from a reading of the contracts, particularly section 8 in each, that it was the intent of the parties, while they were in a co-operative mood, to provide an equal opportunity to each of the interested lines to serve the potential industries. Certainly the proposed enterprise would not have been appealing if any of the parties thought its investment might be lost due to an inability to serve industries in the area. The second paragraph of section 8 protects the parties from this contingency and that is the purpose of the paragraph.
Plaintiff has set forth at length three transactions to show that the parties have not regarded the second paragraph of section 8 as meaning what defendants contend it does. Since the paragraph is not ambiguous, resort to a practical construction is not necessary to ascertain its meaning. Nor would these transactions, when considered most favorably toward plaintiff, constitute a surrender of defendants' rights acquired under section 8. Parties to a contract, may and often do, transact their affairs in a manner not prescribed by the contract for reasons of convenience. A party must affirmatively give up the right in order to surrender it. This is not to say that a party cannot be estopped in certain cases, but that is not the case here.
Plaintiff argues that the decree of the lower court leaves important questions unresolved, such as  what elements constitute "cost," a part of which defendants must pay, and who shall pay the real-estate taxes. These do not appear to be bona fide questions and, in any event, are not pertinent to the issue before us.
Plaintiff argues that the decree of the lower court goes too far in that it allows defendants to use its tracks heretofore described as service tracks. Plaintiff reasons that *581 these tracks are not sidings to an industry and that defendants could run their engines and cars directly into the Glidden Company without using these tracks. The right to use the siding would be a hollow right if defendants could not use these tracks for switching and storage purposes which is necessary to effective use of the siding. It would seem that they are necessary since plaintiff in its complaint states that they are necessary to its Glidden Company operations. We find no error and the decree of the superior court of Cook County is affirmed.
Decree affirmed.